**GREATER NEW YORK HEALTH CARE FACILITIES ASSOCIATION, INC., a New York Not-for-Profit Corporation, Individually and on behalf of its member residential health care facilities, Plaintiff,**

v.

**Peter OTTLEY, Individually and as President of Local 144, Hotel, Hospital, Nursing Home and Allied Services Employees Union, SEIU, AFL–CIO, Defendants.**

No. 80 Civ. 0258 (KTD).

United States District Court,
S. D. New York.

Jan. 21, 1980.

As Amended Jan. 30, 1980.

---

Saxe, Bacon & Bolan, P. C., New York City, for plaintiff; Thomas A. Andrews, Frank A. Romano, Morris Tuchman, New York City, of counsel.

Vladeck, Elias, Vladeck & Engelhard, P. C., New York City, for defendants and also for Peter Ottley, John Kelley, Austin Cedeno and Frank McKinney, individually and as Trustees of the Local 144 Nursing Home Pension Fund and of the New York City Nursing Home—Local 144 Welfare Fund; Judith P. Vladeck, Robert A. Cantore, New York City, of counsel.

Shea & Gould, New York City, for Bartholomew J. Lawson, Nancy Lester, Joyce Burich and Fred Wilkins, as Trustees of The Greater New York Health Care Facilities Local 144—Welfare Fund and Pension Fund; Edwin M. Jones, Joseph Ferraro, New York City, of counsel.[1]

## OPINION AND ORDERS

KEVIN THOMAS DUFFY, District Judge.

This action was commenced by the Greater New York Health Care Facilities Association, Inc. (hereinafter referred to as "the Association" or "Management") against Local 144 of the Hotel, Hospital, Nursing Home and Allied Services Employees Union (hereinafter referred to as the "Union" or "Local 144"), and its president Peter Ottley seeking to enjoin a threatened strike by Local 144 against the Association.

### I

The Association, formerly known as the Metropolitan New York Nursing Home Association, Inc., is a multi-employer association authorized by its several nursing home members to enter into collective bargaining agreements on their behalf.

Local 144 is a labor organization within the meaning of the Labor Management Relations Act, 29 U.S.C. § 141 *et seq.* Peter Ottley serves as the President of the Union. The Union is the exclusive bargaining agent for its approximately 10,000 members employed by the Association in non-supervisory job classifications such as registered nurses, licensed practical nurses and so-called "blue collar" workers. Among those included in the "blue collar" classification are aides, orderlies, porters, kitchen helpers and the like. Since 1965, the Union has been the exclusive bargaining agent for these employees in the facilities owned by members of the Association.

Since 1965, the Association and the Union have maintained a continuous collective bargaining relationship. This relationship has weathered many stormy periods over the years.

On April 26, 1972, the Association and the Union entered into three separate collective bargaining agreements (hereinafter collectively referred to as the "master agreements" or "bargaining agreements"), covering the blue collar employees, the licensed practical and registered nurses. Each agreement provided, *inter alia*, that all controversies concerning their interpretation or application should be resolved by submission of the dispute for binding arbitration and that, during the life of the bargaining agreements and any extensions thereof, there should be no cessation or stoppage of work.

These agreements were effective as of January 1, 1972 and expired November 30,

1. The names ascribed to the Funds in the list of appearances are different solely because the parties denominated them in that manner. There is but one Welfare Fund and one Pension Fund and everyone directly involved herein recognizes that fact. Those entities are referred to in the opinion as the "Welfare Fund" and the "Pension Fund."

1974. Thereafter the Master Agreements were extended through November 30, 1976 with certain amendments. Upon the expiration of the Master Agreements in 1976, the Association and the Union were unable to reach agreement on many of the substantial terms and conditions of their labor contracts. Accordingly, they vested jurisdiction in Eric J. Schmertz, Esq., to mediate the unresolved contract issues. Mr. Schmertz thereafter issued recommendations, dated April 14, 1977 and June 16, 1977, which were incorporated by the Association and the Union into a memorandum extending their contractual agreements (as modified by the Schmertz recommendations) to March 31, 1978.

This latter memorandum agreement executed by the parties specifically provided that if there were any disputes as to the terms of the bargaining agreements, these shall be submitted to Mr. Schmertz for binding arbitration.

Indeed, Mr. Schmertz was called upon to resolve differences between the parties as to the terms of the contracts and he issued an award on January 10, 1978 fixing the terms and conditions of the blue collar labor contract. The master agreements covering the units of licensed practical nurses and non-supervisory registered nurses apparently remained in force as modified. By memorandum dated April 18, 1978, the Association and the Union extended the collective bargaining agreements which existed between them to March 31, 1981 except as expressly modified by that memorandum.

In the meantime on April 14, 1978, Eric Schmertz was appointed as chairman of the State Labor Cost Review Panel. His term in that position expires on December 31, 1981. The Labor Cost Review Panel has jurisdiction over the medicare-medicaid payments made by the State of New York to the Association. The moneys to be paid under medicare and medicaid are derived from the State of New York, the City of New York and the United States Department of Health, Education and Welfare. In negotiations for the funds to be paid to nursing homes, the State acts as an agent for all three governmental authorities in dealing with the Association. At the time of his appointment to the Labor Cost Review Panel, all three governmental agencies recognized that Mr. Schmertz was still the arbitrator for contract disputes between Association and the Union. No one raised any objections to his dual capacity.

It should be clear from the above recitation that there still does not exist in one place a contract or indeed even three contracts covering the relationship between the Association and the Union. From time to time since April 1978, Mr. Schmertz has issued arbitration awards in connection with his position as contract arbitrator; the most recent presented to the Court being May 8, 1979. This award provides for an increase in pension benefits and contributions and an increase in payments to be made to the welfare fund. The welfare fund is an "employee welfare benefit plan" within the meaning of section 302(a)(1) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 et seq. The Welfare Fund provides hospital benefits through contracts with Blue Cross of Greater New York, the Prudential Insurance Company of America and Health Insurance Plan of Greater New York together with dental insurance from AMI insurance company. The Welfare Fund is also a self insurer for surgical benefits and other kinds of health benefits.

The trustees of these funds are Bartholomew J. Lawson, Nancy Lester, Joyce Burich and Fred Wilkins who were appointed by management. Appointed by the Union there is Peter Ottley, John Kelley, Austin Cedeno and Frank McKinney. All of the trustees of these funds are before this Court in related actions of which I will have more to say.

II

With this background I now turn to the various disputes and to a thumbnail explanation of how they arrived before me.

On January 12, 1980, I was presented with a request for an Order to Show Cause and a Temporary Restraining Order to en-

join the Union from carrying out a strike and/or work stoppage against the nursing homes owned by members of the Association and staying the ten day notice served by the Union of its intention to strike. Among the papers attached to the application for the order was a letter addressed to the Association and the Federal Mediation and Conciliation Service and the New York State Mediation Board which reads as follows:

Gentlemen:

Re: Ten Day Strike Notice

You are hereby notified that Local 144, Hotel, Hospital, Nursing Home & Allied Health Services Union and all employees in the bargaining units represented by Local 144 will strike and picket your member nursing homes on Tuesday, January 22, 1980 at 6 A.M. at the location of each such homes as per the attached list.

Very truly yours,

Peter Ottley
President

The Order to Show Cause required the parties to appear before me on Monday, January 14, 1980, at 9:30 A.M. The parties appeared as required and I discovered that there were any number of disputes between them, some of which have already been matters of judicial concern. Some seventeen cases had been removed to this Court from the New York State Supreme Court each involving applications by the Association for stays of arbitration concerning claims made for arbitration by the Union. These cases were all assigned to me. There were also three cases before Judge Owen of this Court brought by the Association against the Union and its attorneys, et al. seeking, among other things, to permanently enjoin the Union and its attorneys from placing liens or restraints against the accounts of Association members.

There was also pending in the New York State Supreme Court, County of New York, before Justice Thomas Hughes, a petition to stay arbitration brought by the management trustees of the Welfare and Pension Funds against the Union trustees of those Funds. This matter has been transferred to this Court by stipulation of the parties and by order of the New York State Supreme Court.[2] Jurisdiction is properly vested in this Court under both the Labor Management Relations Act, 29 U.S.C. § 141 et seq. and the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq.

In addition, on January 17, 1980, a further action was brought by the Union against the Association seeking to enforce a Schmertz arbitration award with regard to pension benefits and the funding thereof. That matter was originally assigned to Judge Owen and has since been reassigned to me. In further addition to all of the above, an action has been instituted by the management trustees against the Union trustees in this Court. Although originally assigned to Judge Sweet, that matter likewise was properly referred to me.

Conferences were held before me in connection with all of these matters throughout the week starting January 14th. On Friday, January 18, 1980, an evidentiary hearing was held in connection with the Order to Show Cause in the captioned matter.

I have taken extraordinary action, albeit with the consent of the parties, over the period prior to and including the hearing of this matter. Since Eric Schmertz has lately resigned from his position as contract arbitrator between the parties, I have appointed John D. Feerick, Esq. as arbitrator in his place and stead with all the powers which Mr. Schmertz originally had. Mr. Schmertz, of course, remains as Chairman of the State Labor Cost Review Panel. Also the seventeen actions which were orig-

---

2. I was somewhat at a loss at the hesitation of the Association trustees and their counsel to enter a stipulation to transfer this matter to me. If this matter were not before me then no injunction could issue. The *sine qua non* of a "no-strike" injunction is a concomitant order for the parties to proceed to arbitration. *See Boys Market v. Clerks Union*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1969).

inally assigned to me and which were Petitions to Stay Arbitration, have all been settled; these actions all involve contributions to the Welfare Fund prior to October 1, 1979 and since the parties have agreed to have Sidney A. Wolff, Esq., act as arbitrator with respect thereto, no further judicial intervention is necessary.

Since Blue Cross had threatened to terminate all hospital coverage for Association employees who were members of the Union and were covered by the contract between Blue Cross and the Welfare Fund on January 15th, I convinced the Association to pay $400,000.00 to the various funds. The Welfare Fund then issued a check in the amount of $400,000.00 to Blue Cross to assure that coverage would continue at least throughout the month of January.

This amount does not pay all of the outstanding bills to Blue Cross which bills amounted, on December 27, 1979, to $1,280,-999.00. The other hospital coverage carriers are similarly in arrears: The Prudential Insurance Company of America as of December 28, was owed $346,500.00 and the Health Insurance Plan of Greater New York was owed $839,429.08 as of January 9, 1980. Only Blue Cross, however, had threatened immediate termination.

On the day of the hearing, the Association voluntarily turned over to the Funds another approximately $200,000.00. Since at least 1977, the Funds have been running as much as three months in arrears in receipts from members of the Association.

There is a dispute as to the amount of money presently in the funds and the cause of these arrearages. Part of this dispute can be taken care of by my decision in the case originally assigned to Justice Thomas Hughes of the New York State Supreme Court and I turn now to my decision in that matter.

### III

As of August 1977, there existed deficiencies in Pension and Welfare Funds covering the Union employees of the Association in the amount of approximately $13,000,-000.00. These deficiencies accrued because members of the Association had not paid the amounts due to the Funds under the collective bargaining contracts. In order to collect these past due payments, a number of arbitrations were instituted which have since matured into arbitration awards. Many of the arbitration awards have been reduced to judgments. There are also a number of confessions of judgment against Association members for amounts due to the Pension and Welfare Funds.

Apparently disputes arose among the management and Union trustees as to the manner in which these judgments were to be collected. The Union trustees insisted that a judgment levy be made attaching the property of the delinquent nursing homes. The management trustees, on the other hand, sought to avoid any levy upon members of the Association.

All the Funds have an equal number of Union trustees and of management trustees and indeed the trustees of both the Pension and Welfare Funds are identical.

Article X, Section 10 of both of the agreements and declarations of trust entered into by and between the Union and the Association and establishing the Pension and Welfare Funds read as follows:

"In the event the trustees are unable to agree on action within seven days, the trustees shall agree upon an impartial arbitrator to decide the matter or question in dispute and in the event or failure of the trustees to agree upon an impartial arbitrator within seven days any one of the trustees may petition the American Arbitration Association for the appointment of an impartial arbitrator whose decision on the matter shall be final and binding."

Disputes have arisen over the past year between the two sets of trustees and at a meeting in early October 1979, there appears to have been a complete breakdown in any real discussion between the management trustees and the Union trustees as to the means of handling member nursing homes delinquent in contributions to the funds. This culminated at a meeting on

November 13, 1979, which found the trustees totally deadlocked and unable to resolve a single item on the agenda. The Union trustees thereafter attempted to invoke the arbitration provisions of the agreements giving rise to the trust funds. On November 15, 1979, the Union trustees commenced two arbitrations, one involving the dispute concerning delinquent employers and the other involving all other items on the proposed agendas for the November 13, 1979 meeting.

The management trustees thereafter sought a stay of arbitration in the Supreme Court of the State of New York, New York County. The petition was based on two grounds: First, the management trustees attacked the timeliness of the Union's action; and, second the management trustees alleged that notice and demand for arbitration was insufficient in that there had not been set forth specifically the issues to be decided by the arbitrator.

In the stipulation for the order removing this action to this Court there was a waiver by the parties of any objection based upon timeliness.

In any event it is clear that the issue of timeliness would not have been sufficient to stay the arbitration. *See Conticommodity Services Inc. v. Phillip & Lion*, 613 F.2d 1222 (2d Cir. 1980).

■ Indeed the *Conticommodity* case teaches that the work of the District Court is to determine whether in fact the parties are governed by a binding arbitration provision and that there is a refusal to arbitrate. All other matters are to be determined by the arbitrator after referral by the court. It is clear in the instant matter that the arbitration provision contained in the agreements and declarations of trust which underlie the activities of the trustees of the Funds does contain an appropriate binding arbitration provision. Thus, even if the parties had not waived question of timeliness by stipulation, it would have been, in any event, a matter to be decided by the arbitrator.

■ I am left therefore merely with the management objection as to whether the issues to be decided by the arbitrator are set forth clearly so that the parties and also the arbitrator can determine exactly what is to be decided. As to both of the demanded arbitrations, the issues seem clearly set forth by the November 13, 1979 meeting of the trustees of the Funds at which the impasse arose. The impasse clearly involves matters within the arbitration provisions. An arbitrator is not merely a person who, in settling a dispute, is to vote "yea" or "nay" as to a specific solution. The role of an arbitrator is much broader than that. At times he must devise a solution, perhaps hidden to the parties, which will resolve the dispute. The issues to be decided by the instant arbitrations thus are sufficiently clear so as to permit understanding by an arbitrator who, after considering all of the facts and the arguments on both sides, can fashion a resolution of the dispute.

That the issues are not neatly framed is of no import. To require that the issues to be submitted to an arbitrator be neatly delineated in the fashion of code pleading is not required. If there be need for any further demarcation as to the issues herein, that matter can be resolved by the arbitrator. If there were any other decision by this Court it would produce, and, in fact could induce, continuing procedural delays in the resolution of questions requiring speed and simplicity in handling. *See Conticommodity Services Inc. v. Phillip & Lion, supra.*

The petition originally submitted by the Association trustees to the New York State Supreme Court to stay arbitration is therefore denied and the parties are directed to proceed to arbitration of the matter before an impartial arbitrator appointed by the American Arbitration Association within the next five days.

### IV

With the resolution ordered by this Court as to the arbitration to be had between the trustees of the Pension and Welfare Funds, it would appear that the first trio of cases

originally before Judge Owen of this Court may eventually be mooted. In those actions the Association is seeking an injunction against the Union trustees and the Union's attorneys to stay them from levying upon or otherwise restraining or attaching the accounts of members of the Association in connection with the collection of judgments against those Association members who have been delinquent in their contributions to the Funds. Since the arbitration ordered by the preceding section will resolve the dispute among the trustees of the Funds concerning the collection of these delinquent accounts, it would appear that this action may be unnecessary. However, the action is not ripe for decision at this point.

## V

At last I turn to the issues presented by the captioned matter. The Association, as noted above, is seeking a preliminary injunction to forestall a strike by the Union at the nursing homes owned and operated by Association members. As noted above, the Union has already given a ten day notice of strike.

That there exist collective bargaining contracts between the parties is not in dispute. The expiration date for the present bargaining agreements is March 31, 1981. These collective bargaining agreements all contain a no strike—no lockout provision which states:

> "During the term of this agreement and any extension thereof, the union shall not call or authorize any strike against any employer covered by this agreement and no employer shall effect any lockouts during the term of this agreement."

In addition to the various arbitration provisions mentioned above, there is also a grievance procedure set forth in the labor agreements. This contract grievance procedure applies to all complaints, disputes, controversies, or grievances arising between the parties involving questions of interpretation or application of any clause of the labor agreements or any acts, conduct, or relations between any of the parties and/or

between the Union and any employer directly or indirectly. The grievance machinery provides that those grievances not adjusted by and between the parties involved "shall be submitted to the impartial chairman . . . for arbitration and his decision shall be final and binding upon the parties . . . ."

It is the position of the Association that the rationale of the Supreme Court in *Boys Market v. Clerks Union*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1969), requires that this Court enter an injunction to stop the threatened strike. In the *Boys Market* case the Supreme Court recognized that a binding arbitration provision in labor contracts is the *quid pro quo* for a no strike clause. *Cf. Buffalo Forge Co. v. Steelworkers*, 428 U.S. 397, 407, 96 S.Ct. 3141, 3147, 49 L.Ed.2d 1022 (1975). In *Boys Market*, the Supreme Court affirmed the issuance of an injunction to enforce the no strike obligation in view of the mandatory arbitration provision and the arbitrability of the disputes in issue.

■ In the case at bar I am presented with a "no strike" clause and mandatory arbitration. But it should be recognized that the existence of the two provisions does not, in and of itself, mean that this Court must issue the requested injunction. Such a restrictive view ignores the fact that an injunction is an equitable remedy.

"A District Court entertaining an action under § 301 may not grant injunctive relief against concerted activity unless and until it decides that the case is one in which an injunction would be appropriate despite the Norris-LaGuardia Act. When a strike is sought to be enjoined because it is over a grievance which both parties are contractually bound to arbitrate, the District Court may issue no injunctive order until it first holds that the contract *does* have that effect; and the employer should be ordered to arbitrate, as a condition of his obtaining an injunction against the strike. Beyond this, the District Court must, of course, consider whether issuance of an injunction would be warranted under ordinary principles of equi-

ty—whether breaches are occurring and will continue, or have been threatened and will be committed; whether they have caused or will cause irreparable injury to the employer; and whether the employer will suffer more from the denial of an injunction than will the union from its issuance." *Sinclair Refining Co. v. Atkinson,* 370 U.S. 195 at 228, 82 S.Ct. 1328 at 1346, 8 L.Ed.2d 440 (1968), quoted with approval in *Boys Market v. Clerks Union, supra,* at p. 252, 90 S.Ct. at 1593.

When the captioned action was originally initiated, it would appear that the Association may have violated or caused the violation of the intent of the various arbitration clauses referred to above. It is not enough to say that disputes are arbitrable or indeed even to go to arbitration. The results of these arbitrations must be implemented.

In this case, the relations between the parties are pockmarked with a failure to live up to the spirit of arbitration. The failure of the parties to agree on an impartial contract arbitrator after the resignation of Eric Schmertz is evidence of this. The fact that the Association had moved to stay arbitration in at least seventeen cases is further evidence of this fact. That enforcement of arbitration awards and judgments thereon as well as confessions of judgment have been thwarted by the Association trustees and thus permitted to lie fallow without ultimate resolution is further evidence of this. The fact that the funds were unable to pay, for whatever reason, the premiums due for the hospital coverage of the Union employees of the members of the Association is further evidence of this. The fact that the Association's members on the board of trustees for the various Funds have permitted an impasse to totally deadlock the boards and in fact strangle the Funds in providing the agreed benefits for the employees is yet further evidence of this.

The Association's argument attempting to divorce itself from any responsibility for the activities of the Funds' management trustees is pure sophistry and an attempt to exalt form over substance. It is true that the management trustees, in their activities in connection with the funds, are, as a matter of law, fiduciaries for the beneficiaries of the funds and are acting supposedly wholly apart from whatever position they might have either in management or in the Association. But their activities in voting as a unit and permitting an impasse in connection with the activities of the Funds so as to seriously jeopardize benefits clearly owing to the employees raises in my mind serious questions. It is not my intent, however, at this point to assess fault.

Likewise, however, the Union and Mr. Ottley appear to have unclean hands. The Temporary Restraining Order issued by this Court specifically prohibited the strike or work stoppage. Yet the Union, apparently with the approval of Mr. Ottley, has issued various strike notices to its members indicating that a strike would occur on January 22, 1980, and specifically stating "Federal Judge Duffy denies employers a petition for strike injunction!" This is not so. I am not sure whether this statement was inserted into the strike bulletins through inadvertence, misunderstanding or intentional misrepresentation. Whatever equity the Union may have had in its frustration to resolve the benefits disputes and to continue the insurance coverages for its members, however, is outweighed by the fact that its members were not advised of the true situation.

Turning once again to the Association, I must conclude that it has apparently turned over a new leaf since at least January 12th. This may have been caused by the threat of an imminent strike and the Union may argue that this new attitude will dissolve as soon as the threat of an imminent strike has passed. The easy answer to this however is that this Court intends to retain jurisdiction over the parties and their dispute.

Balancing equities, as I must in this case, however, does not involve merely the activities or intentions of the parties to these actions. There are many thousands of elderly and infirm patients presently being cared for in the nursing homes owned and operated by members of the Associa-

tion. The care needed by these people is supplied in great part by members of the Union. I am sure that neither the Association nor the Union wishes to injure these totally innocent people. Perhaps I would not be so hopeful or so impressed by the equity I see on the Association's side if this were an industry engaged in the manufacture of some non-essential inanimate trinkets. This industry does not involve inanimate objects it deals rather with human life. In such a situation I cannot but find that the equities presented by the overall view of the situation are such as to mandate an injunction against any strike by the Union employees.

Indeed the affidavits first submitted on behalf of the Union in response to the Association's request for a preliminary injunction set forth three conditions which if brought about, would admit the equitable relief sought. Each of these conditions in effect has been satisfied. The conditions were:

(1) That the association arrange for "the continuation of all health care benefits for Local 144's membership";

(2) that the Association "agree, not merely promise to agree, on a successor to Mr. Schmertz"; and

(3) "withdraw all motions to stay arbitration . . . ." [Affidavit of Robert A. Cantore, dated January 14, 1980].

The first of these conditions, that is, continuation of health care benefits, refers to the continuation of the Blue Cross hospital benefits. As I have already pointed out in this opinion, the Association has delivered to the Funds checks from its members approximating $600,000.00. I further pointed out that $400,000.00 has already been paid to Blue Cross. Thus, this particular condition has been met.

The second condition set forth by the Union was an agreement by the Association as to a successor to Mr. Schmertz. While there was no agreement between the parties as to the successor, there was agreement that I could make the selection and I have. As I have already indicated in this opinion John D. Feerick, Esq. is the successor to Mr. Schmertz.

The third condition is that the Association and its members withdraw all motions to stay arbitration. Whether these motions were withdrawn or otherwise disposed of is of no matter. The fact is they have all been disposed of.

Thus, even in the Union's view, the Association is entitled to the injunction. I can understand the Union's frustration over the past history of its relationship with the Association, but that frustration does not justify the strike at this point. Having obtained all the relief which the Union could reasonably have expected to obtain by means of job action, it is clear to me that any strike in the circumstances can be deemed purely vindictive.

The members of the Union not only "care" for the patients at the nursing homes in the medical sense of the word but also in the sense that they have concern for these aged and infirm people. It would thus be a travesty to have a strike where the Union and, through the Union, the employees have achieved everything that could be expected by a work stoppage.

## VI

There remain two open matters before me. There is the last case which was originally assigned to Judge Owen. In that matter the Union seeks confirmation of an award by Eric Schmertz increasing pension benefits and also increasing the rate of contribution by Association members to the Funds. It is clear that that case is not yet ripe for disposition. The defendants, however, are ordered to submit an answer in that matter within ten days of the date of this opinion. Thereafter, either side may make a motion for judgment within fifteen days after the submission of the answer.

The other matter involves a law suit brought by the Association and its trustees against the Union and its trustees. That matter clearly is not ripe for disposition at this point. The defendants there, however, are ordered to serve and file their answer within twenty days of the date of this opin-

 

ion. Then within ten days after the filing of the answer that action will be conferenced before me so that the issues may be clearly delineated.

## VII

I have attempted by this opinion to resolve in an orderly fashion all of the lawsuits presently pending between the parties.

In summary the following has been done:

1. The health care benefits of the Union members employed by the Association have been continued by payments of approximately $600,000.00 by members of the Association.

2. All arbitrable disputes between the parties have been ordered to proceed to arbitration.

3. John D. Feerick, Esq., has been appointed as impartial contract arbitrator to replace Eric Schmertz and is hereby requested by this Court to reduce the three contracts between the parties to three, clear documents, understandable to the employees and the operators of the nursing homes and health care facilities.

4. Outstanding litigation has been placed on a strict timetable with a view toward the earliest possible disposition.

I recognize that much is left to be done. I know that the resolution of all these arbitrations will not be easy. But it can be done, it must be done, and it will be done.

To the extent that I have not yet issued specific orders in these cases, this opinion is to constitute such orders as may be necessary to effectuate it. This Court retains jurisdiction over all the parties and all the actions.

SO ORDERED.

## ORDER

A hearing having been had herein and a lengthy detailed opinion having been completed which disposes of much of the controversy between the parties (which opinion will be published and filed within the next three days) and it being the opinion of this Court that the precipitating causes of the dispute herein having been disposed of thereby; it is hereby

ORDERED, a preliminary injunction is issued enjoining the defendants and the Union defendant's officers, agents, employees and members from striking or threatening to strike, or causing a work stoppage or threatening to cause a work stoppage at the nursing homes and health care facilities of the members of the plaintiff until such time as the matters before me are resolved.