**The NEW YORK TIMES CO., Plaintiff,**

**v.**

**NEWSPAPER AND MAIL DELIVERERS' UNION OF NEW YORK AND VICINITY, Defendant.**

**No. 84 Civ. 5759 (CSH).**

United States District Court, S.D. New York.

Aug. 17, 1984.

---

Seyfarth, Shaw, Fairweather & Gerald-
son by Michael L. Hirschfeld, New York
City, Jeremy P. Sherman, Chicago, Ill.,
Jedd Mendelson, New York City, for plain-
tiff.

Lippman & Lippman by Marshall E.
Lippman, New York City, for defendant.

## MEMORANDUM OPINION
## AND ORDER

KRAM, District Judge.

The above-captioned action is before this
Court upon the motion of plaintiff The New
York Times Co. ("the Times") for an order
pursuant to Rule 65 of the Federal Rules of
Civil Procedure preliminarily enjoining de-
fendant Newspaper and Mail Deliverers'
Union of New York and Vicinity ("NMDU"
or "the Union") from engaging in any work
stoppage, or otherwise interfering with the
Times' operations at its New York City and
Carlstadt, New Jersey plants, as a result of
the Times' assignment of certain work to
members of another union (more fully de-
scribed below). For the reasons stated be-
low, the Times' motion is GRANTED.

## BACKGROUND

The Times, a New York corporation with
its principal place of business in New York
City, is engaged in the publication of a
daily newspaper known as "The New York
Times." The Times maintains manufactur-
ing facilities in New York City and New
Jersey.

The Union is an incorporated association
and serves as the collective bargaining rep-
resentative for certain employees employed
by the Times at its New York City and
New Jersey plants.

The Times and the Union are, and, at all
relevant times, were, parties to a collective
bargaining agreement ("the Agreement")
governing the Times' employment of em-
ployees represented by the NMDU.[1] The
various provisions of the Agreement that
are relevant to the factual background or
ultimate disposition of this motion are far
too lengthy to set out here. The following
summary of those provisions should, how-
ever, suffice.

Section 2, among other things, makes it
clear that the Agreement is not intended
to, and does not, alter the "prevailing con-
ditions" in the mailrooms of the Times'
plants insofar as certain tasks were, and
are, performed by members of the other
unions operating therein. Section 2–H.1.

Section 16, among other things, estab-
lishes an intricate, mandatory grievance
resolution procedure for "[a]ll grievances,
differences and disputes arising out of the
interpretation or application of this Agree-
ment which cannot be settled at the plant
level," Section 16–A. The procedure estab-
lished calls for binding arbitration of dis-
putes and creates mechanisms to obtain
speedy relief when necessary. Section 16
further provides that neither party may
effect a "change in condition" without the
consent of the other party. Section 16–
M.3. If a unilateral change is made, the
aggrieved party may ask the "Impartial
Chairman (Status Quo)" ("status quo arbi-
trator"), to issue a status quo order direct-
ing that conditions be restored to those
existing before the change, and maintained
as the status quo, pending resolution of the
dispute. Section 16–M.4. Finally, Section
16 specifically prohibits strikes, lock-outs,
and work stoppages "except as against the

1. Although the Court was not furnished with a
copy of the Agreement currently in effect, it
does appear that all of the relevant, operative,
sections are before the Court.

party failing to comply with a decision, award or order of" an arbitration panel established by the Agreement. Section 16–N.

Section 22 indicates that the NMDU has exclusive jurisdiction over the Sta-Hi Newstrack, "including but not limited to, operations, control and clearing jams." Section 22–A.

The Stay-Hi Newstrack is one of the items of machinery at the Carlstadt plant. It is comprised of three loops, referred to as A, B, and C Loops. One of the functions of the loops is to convey bundles of printed papers for loading and shipment out of the plant for sale to the public.

Apparently, every night A Loop is cleaned out by members of NMDU. Six nights a week, B and C Loops are cleaned out by members of NMDU. A grievance arose in the summer of 1983 concerning who was entitled to clean out B and C Loops on the seventh night, Saturday night/Sunday morning. For a number of years prior to 1983, the Saturday night/Sunday morning clean up of B and C Loops was performed by members of the New York Mailers Union, Local Six ("the Mailers").

In June, 1983, the Union filed a grievance seeking to have that work assigned to its members. The Union first applied to the then status quo arbitrator, Professor Thomas G.S. Christensen, for an order requiring the immediate assignment of that work to NMDU members. In a decision apparently issued on or about June 20, 1983,[2] the status quo arbitrator indicated that he thought the Union correct in asserting that it had jurisdiction to do the work disputed by virtue of Section 22 (discussed above). Nonetheless, he noted that performance of the task by the Mailers was the "prevailing condition," and, reading the Agreement to avoid conflict between Sections 2–H.1. and 22, declined to "disturb"

that practice by requiring any status quo order directing the Times to reassign the work to NMDU members. Exhibit C to Defendant's Verified Answer, pp. 6–9. The status quo arbitrator further reaffirmed prior orders precluding a stoppage of work. *Id.*, p. 9.

In spite of this decision and order, NMDU members engaged in a work stoppage on June 25, 1983.[3] The Times came to this Court on that day and obtained a temporary restraining order against that work stoppage. On Monday, June 27, 1983, the Times filed an action in this Court pursuant to section 301 of the Labor-Management Relations Act ("LMRA"), as amended, 29 U.S.C. § 185, and the Federal Arbitration Act, 9 U.S.C. § 9. Also on June 27, 1983, the status quo arbitrator issued a ruling confirming his prior orders. Exhibit A to Plaintiff's Reply Memorandum. Therein, Professor Christensen said "[p]ending possible peaceful resolution ... by negotiation, arbitration or other forums ... a Status Quo Order to the Times requiring immediate assignment of the disputed work to the Union is *not* justified." *Id.* (emphasis in original). He further reiterated his ruling that no work stoppage was justified.

Relying in large part on the Union's violation of the status quo arbitrator's rulings, this Court issued a preliminary injunction on June 30, 1983, against the NMDU forbidding any further work stoppages or interference with the normal operations of the Times' plants in relevant respects. *The New York Times Co. v. NMDU*, No. 83–4833, slip op. (S.D.N.Y. June 30, 1984).[4]

In an effort to finally resolve this jurisdictional dispute, the Times filed charges with the National Labor Relations Board ("NLRB" or "the Board") against both the Union and the Mailers alleging violations of section 8(b)(4)(D) of the National Labor Relations Act ("NLRA"), as amended, 29 U.S.C. § 158(b)(4)(D). Pursuant to section

---

**2.** Although undated, the decision is referred to in a subsequent document dated June 27, 1983. Exhibit A to Plaintiff's Reply Memorandum.

**3.** The Mailers had threatened a work stoppage four days earlier should the Times divest its members of this task.

**4.** Exhibit B to Plaintiff's Reply Memorandum.

10(k) of the NLRA, 29 U.S.C. § 160(k), the NLRB conducted hearings on these charges. Thereafter, pursuant to section 10(*l*) of the NLRA, 29 U.C.C. § 160(*l*), the NLRB commenced an action in this Court against the Union. On June 30, 1983, this Court also granted the NLRB's motion for a preliminary injunction against the NMDU prohibiting work stoppages, or threats thereof, aimed at securing the task of cleaning B and C Loops on Saturday nights. *Silverman v. NMDU*, No. 83–4879, slip op. (S.D.N.Y. June 30, 1983).[5]

On December 22, 1983, the NLRB issued its determination of the jurisdictional dispute. Exhibit A to Defendant's Verified Answer. The NLRB found that neither union was clearly entitled to this task based on their respective agreements with the Times, or, in other words, that each could arguably be entitled to it according to the collective bargaining agreements. *Id.* at 6. The Board did find, however, that the Times' preference and past practice favored assignment of the task to the Mailers. *Id.* at 5–6. Ultimately, the NLRB found that the Mailers were entitled to continue performing the "cleanup of loose papers *and other debris*" from B and C Loops after the Saturday night press run and that the Union was not entitled to engage in a work stoppage, or threaten thereto, in order to obtain that work. *Id.* at 8–9 (emphasis added).

From December, 1983, until July or August, 1984, the work was performed by the Mailers without incident. On or about July 31, 1984, however, the Times informed the Union that it intended to change the handling of certain papers left after the press run on Saturday nights. Prior to August 11, 1984, *bundled* papers remaining in B and C Loops after the press run were removed from the loops by NMDU members for shipment to the New York City plant to be used to correct shortages in deliveries to

sellers. As discussed, loose papers were cleaned out by the Mailers and discarded. As of August 11, 1984, the Times would no longer use the remaining *bundled* papers at Carlstadt for sale. Rather, any shortages would be remedied by additional printings in New York City, and the remaining Carlstadt bundles would be discarded as waste. Having designated the remaining bundles as waste or "debris," the Times planned to have the Mailers remove them from the loops during clean up operations.

Once again, the Union resorted to the grievance procedures of the Agreement. The Union filed a grievance with the present status quo arbitrator, Mr. Adelman, requesting a status quo order prohibiting the Times from assigning the task of removing waste bundles from the loops to the Mailers. The NMDU argued that it had always removed bundled papers, that such were not properly "debris" within the NLRB's ruling, and that the change in the designation of the product, and in the persons responsible for removing it from the loops, was a unilateral change in prevailing conditions forbidden by Section 16–M.3. of the Agreement.[6] The status quo arbitrator declined to issue a status quo order, thus permitting the Times to proceed.

The Times then sought a status quo order from Mr. Adelman forbidding a work stoppage or other interference. The status quo arbitrator did make such an order.

At approximately 5:35 A.M., Sunday, August 12, 1984, after the completion of the press run, the Times directed the Mailers to commence cleaning out the loops, including removal of bundled waste papers. In spite of the order of the status quo arbitrator, and the general no-strike provision of the Agreement (Section 16–N), the Union effected a work stoppage effectively closing down the Carlstadt plant before the Mailers could clean the loops, thereby threaten-

---

**5.** Exhibit C to Plaintiff's Reply Memorandum.

**6.** Since the Court was not privy to the telephonic communication between the Union and Adelman, it is impossible to know exactly what the Union argued. Nonetheless, it appears from the semantics chosen by the Union in setting out what it "asserted" (Defendant's Memorandum of Law, p. 2) and its additional argument (p. 3), that these were the essential arguments put before the status quo arbitrator.

ing to prevent the production of Monday's newspapers.

The Times applied to this Court *on Sunday*, August 12, for a temporary restraining order ending the work stoppage and for the preliminary relief sought herein. After a hearing at which testimony was taken and the arguments of counsel heard, this Court did issue the temporary restraint, which expires today at 2:45, and reserved judgment on this motion. The Times effected the filing of its complaint herein (alleging jurisdiction under Section 301 of the LMRA, 29 U.S.C. § 185) the following day.

## DISCUSSION

The Times' motion for preliminary relief is now before the Court. Essentially the Court is faced with two issues at this time. First, does this Court have jurisdiction to entertain the Times' claims seeking preliminary relief and to compel the Union to arbitrate this dispute in accordance with the Agreement? Second, if so, does this Court have the authority to enjoin any further work stoppages by the Union and should it exercise that authority?

1. Jurisdiction

The Times alleges that this Court has jurisdiction over this claim pursuant to section 301(a) of the LMRA, 29 U.S.C. § 185(a). The Union, on the other hand, argues that this Court is without jurisdiction to entertain this suit—either because the suit merely seeks the enforcement and clarification of a prior NLRB ruling, and therefore belongs in the Court of Appeals, or because it involves an unfair labor practice and pure jurisdictional dispute, and therefore belongs with the Board. This Court agrees with the Times.

The fallacy of the Union's argument that this dispute belongs in the circuit court is evident from the fact that the Union did not, and has not, appealed to the circuit court for relief. Section 10(f) of the NLRA, provides, in relevant part, that "[a]ny person *aggrieved* by a final order of the Board... may obtain review of such order" in the appropriate circuit court. 29

U.S.C. § 160(f) (emphasis added). The Times simply is not a party aggrieved by the NLRB ruling. The NLRB ruling found that the Times' charges against both the NMDU and the Mailers were substantiated by the facts—i.e., that each had committed an unfair labor practice under section 8(b)(4)(D). The NLRB ruling also determined, finally, that the Mailers were entitled to perform what were at least then the traditional clean up tasks for B and C Loops on Saturday night. If anyone was aggrieved by that ruling, it was the NMDU and it should have, but did not, appeal.

Moreover, assuming *arguendo* that the NLRB ruling extends to the award of the removal of bundled papers, designated by the Times as waste, to the Mailers, the Times again is not the aggrieved party. The Union would be the party aggrieved by such a ruling and it still has not sought review of that ruling. The Times is not aggrieved by the ruling, but rather by the Union's self-help efforts to evade the Board's ruling (assuming its applicability).

In fact, however, this is not a dispute with the NLRB ruling. In the words of a recent television commercial, "Where's the beef?" The beef here is between the NMDU and the Times, and concerns the NMDU's entitlement, under the Agreement, to continue performing certain tasks rather than having them designated for performance by the Mailers. Seen in this light, the Union is correct in asserting that the Times can file new charges with the NLRB under Section 8(b)(4)(D) of the NLRA, and that the NLRB might then proceed to the district court pursuant to Section 10(l) of the NLRA. The Times, however, is not precluded from *also* seeking relief under section 301. *Carey v. Westinghouse Elec. Corp.*, 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964). *Carey* involved a situation very similar to the one facing the Court here. Two unions were engaged in a jurisdictional dispute with their employer. One of the unions had petitioned a state court for an order compelling arbitration in accordance with its agreement. The state court refused to en-

tertain the suit because it was within the "exclusive jurisdiction" of the NLRB (and that refusal was affirmed to the highest state court). The Supreme Court reversed those rulings. The Court recognized that there are really two species of "jurisdictional" disputes—first, whether certain work should be assigned to members of one or another competing union; second, whether workers performing a particular task should be represented by one or another competing union. 375 U.S. at 263, 84 S.Ct. at 404.

The Court felt the former an easier case than the latter. Since Congress could not have intended to create a situation where a work stoppage, or at least a threat thereof, was necessary to trigger some relief mechanism in light of the avowed objective of the national labor laws to strive for peaceful resolution of disputes, especially through arbitration, *id.* at 264–65, 84 S.Ct. at 405, the Court concluded that arbitration was available as a means of addressing the dispute. *Id.* at 265–66, 84 S.Ct. at 405–06. The Court went on to hold that arbitration was also an available means of addressing the "representational" dispute.

Since arbitration is an alternative means of addressing the jurisdictional dispute, parallel with resolution by the Board, the Court held that section 301 and like state provisions could be used to compel arbitration of such a dispute where an agreement to arbitrate exists. *Id.* at 268, 84 S.Ct. at 407.

The Court holds that this case is governed by the discussion in *Carey* of "work assignment" jurisdiction disputes.[7] I am not persuaded that the existence of the NLRB ruling governing "traditional" clean

up at all changes the situation here. This is essentially a new dispute concerning the assignment of the task of removing bundled newspapers now designated as waste product (although *arguably*[8] governed by the prior NLRB ruling).

It cannot seriously be gainsaid that this Court has jurisdiction, pursuant to section 301, over claims to compel arbitration in accordance with a collective bargaining agreement to arbitrate disputes. *See Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). As discussed above, this is true even where the underlying dispute is a jurisdictional one. *Carey*, 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320. Thus, the court has jurisdiction over the Times claims here seeking to compel arbitration of this jurisdictional dispute in accordance with the Agreement.

2. Right to Injunctive Relief Precluding Work Stoppages.

■ The right of an employer to obtain an injunction against its employees prohibiting them from striking is narrowly proscribed by the Norris-LaGuardia Act, 29 U.S.C. § 101 *et seq.*[9] Section 4 of the Norris-LaGuardia Act precludes federal courts from issuing injunctions against work stoppages. 29 U.S.C. § 104(a). The Times argues forcefully that it is entitled to the injunctive relief it seeks in accordance with two recognized exceptions to that anti-injunction provision—first, the so-called *Boys Markets* exception, and, second, an exception allowing the specific enforcement of arbitration awards including prohibitions on work stoppage.

In the seminal case of *Boys Markets, Inc. v. Retail Clerk's Union, Local 770*,

---

7. The parties apparently agreed last year when addressing that dispute that alternative avenues of redress were available since both were applied.

8. The Court has no intention of addressing the underlying merits of this dispute, or commenting thereon. Nonetheless, it should be noted that the resolution of the 1983 dispute, in this Court's opinion, does not necessarily presage, nor certainly foreclose, the ultimate determination of *this* dispute on the merits.

9. Cognizant that the power of this Court to issue any restraint on the Union's right to strike, temporary or preliminary, was narrowly circumscribed, and that the procedures governing an application for such were likewise prescribed, 29 U.S.C. § 107, this Court conducted an evidentiary hearing on Sunday August 12 and has given this motion expedited treatment in order not to run afoul of the five day limitation period contained in section 7 of the Norris-LaGuardia Act.

398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1975), the Supreme Court held that federal district courts have the power, pursuant to section 301 of the LMRA, to enjoin strikes in contravention of a mandatory arbitration agreement and a no-strike clause, in spite of the anti-injunction provision of the Nor-ris-LaGuardia Act. Subsequent cases have refined the *Boys Markets* exception. *See, e.g., Buffalo Forge Co. v. United Steelworkers*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976). The district court now can issue an injunction against a work stoppage and order that arbitration proceed if the following conditions are met: 1) there is a mandatory grievance procedure in the collective bargaining agreement; 2) the underlying dispute involved is subject to that mandatory grievance procedure, *see Buffalo Forge*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022; 3) there is a no-strike provision in the agreement; and 4) the traditional requirements of equity—irreparable harm and a balance of hardships,—are satisfied, *see Boys Markets*, 398 U.S. at 254, 90 S.Ct. at 1594 (*quoting Sinclair Refining Co. v. Atkinson*, 370 U.S. 195, 228, 82 S.Ct. 1328, 1346, 8 L.Ed.2d 440 (1962) (dissenting opinion)). *See, e.g., Elevator Mfrs.' Ass'n of New York, Inc. v. Local 1, International Union of Elevator Constructors*, 689 F.2d 382 (2d Cir.1982); *Greater New York Health Care Facilities v. Ottley*, 493 F.Supp. 612 (S.D.N.Y.1980).

There is no dispute as to the existence of a mandatory grievance procedure in the Agreement. Section 16 clearly establishes one.

The Union claims that there is no arbitrable underlying dispute. The Court does not agree. The Union claims that it has "already obtained an interpretation that it enjoys jurisdiction to perform the work in question." Defendant's Memorandum of Law, p. 5. Presumably, the Union is referring to the status quo arbitrator's 1983 ruling that, *on its face* Section 22 appears to give the NMDU jurisdiction over the traditional clean up of B and C Loops. Nonetheless, the status quo arbitrator declined to rule that the NMDU should be assigned that task because Section 2–H.1.

seemingly protected the Mailers' jurisdiction to perform it. Indeed, it is beyond peradventure that *every* ruling thus far announced has held that the traditional clean up procedures are properly assigned to the Mailers. Moreover, the NLRB specifically found that the contracts of both unions, on their face, seem to provide jurisdiction over that work. No ruling whatsoever, other than the status quo arbitrator's denial of the Union's August 10 or 11, 1984, request, has involved this specific work—removing bundled papers designated as waste. The Times, of course, can argue to the arbitrator that this task falls within the NLRB ruling, but the Union can argue equally forcefully that it does not.

■ Indeed, the Union has implicitly admitted that this is an arbitrable issue. The NMDU took its grievance to the status quo arbitrator in accordance with the Agreement. The Union cannot now be permitted to claim that this is not arbitrable simply because it does not like the results of preliminary arbitration.

The Union argued to the status quo arbitrator that Sections 16–M.3. and 22 preclude this change in assignment. The Union now argues also that Section 2–H.1. and the 1983 decision of the status quo arbitrator prohibit this reassignment. Certainly, those are disputes arising under the Agreement and involving interpretation of the Agreement and fall within the broad mandatory grievance procedure contained in Section 16–A.

■ The Union also argues that this work stoppage is not prohibited by a no-strike provision. The Court does not agree. The Union's argument goes as follows: Section 16–N. prohibits all strikes "except as against the party failing to comply with a decision, award or order of the Joint Standing Committee, the Adjustment Board or the Appeals Board;" the 1983 status quo arbitrator ruled that Section 2–H.1. precluded changing the assignment of the then disputed work without following proper procedures; the Times has changed work assignments in violation of

that ruling; therefore, the Union can strike against the Times for failure to comply.

This argument is fundamentally flawed. First, the status quo arbitrator ruled that Section 2–H.1. precluded reassigning traditional clean up functions from the Mailers to the NMDU. There has been no ruling relevant to *these* tasks other than that of the 1984 status quo arbitrator's ruling against the Union. Furthermore, a decision by the status quo arbitrator does not fall within the "exception" proviso of the no-strike clause.[10]

In sum, there is a broad mandatory grievance procedure in this Agreement, the underlying dispute is subject to that procedure, and there is a no-strike provision presumptively prohibiting the Union's work stoppage.

■ The Times argues forcefully that an injunction is also authorized as specific enforcement of an arbitral award—to wit, status quo arbitrator Adelman's order precluding the Union from engaging in a work stoppage. Since the Court has determined that a *Boys Markets* injunction is available, we need not reach that question here.[11]

■ The Court further finds that the traditional indicia compelling equitable relief are present. The Times will suffer irreparable harm if the Union is permitted to engage in work stoppages effectively shutting down the plants and preventing the Times from publishing its papers especially since a shut down in publication is likely to lead to lost goodwill. *See, e.g., New York Times Co. v. NMDU*, 464 F.Supp. 1281, 1284 (S.D.N.Y.1979).

Moreover, the balance of hardship clearly tips in favor of the Times. They appear to have followed all contractual obligations in good faith. They would suffer greatly from a work stoppage. The Union, on the other hand, will not sustain any injury by being held to its agreement to arbitrate this dispute without recourse to a work stoppage.

NOW THEREFORE, upon the above finding that a preliminary injunction is indicated in this case, it is hereby

ORDERED that defendant NMDU, its officers, representatives, agents, servants, employees, attorneys, collection agencies and all members and persons acting in concert or participation with it or them be and they hereby are ENJOINED and RESTRAINED, pending the resolution of this dispute by the agreed upon arbitration procedures, from threatening, instigating, directing, encouraging, coercing or restraining the New York Times Co., or engaging in or threatening to engage in a work stoppage, where an object thereof is to force the Times to assign employees who are members of, or represented by, the NMDU the task of removing bundles of papers designated as waste from the Sta-Hi Newstrack, B and C Loops, on Saturday nights, rather than to employees who are members of, or represented by, the New York Mailers' Union, Local Six, and it is further

ORDERED, that the parties hereto are to proceed to arbitration in accordance with the mandatory grievance procedures of the collective bargaining Agreement forthwith, and shall attempt to obtain the consent of the New York Mailers' Union, Local Six, to

---

10. The Court notes that when an argument is conceivable that the status quo arbitrator's orders should be given credence here (because arguably favorable to the Union) the Union does not hesitate to make it, in spite of its argument that this Court should not "confirm" status quo arbitrator Adelman's order.

11. The Court does note, however, that this issue is not without difficulty. *See New Orleans Steamship Ass'n v. General Longshore Workers, Local 1418*, 389 F.2d 369 (5th Cir.) (agreement must specifically provide arbitrators with authority to enjoin work stoppage), *cert. denied,*

393 U.S. 828, 89 S.Ct. 92, 21 L.Ed.2d 99 (1968); *see also New York News, Inc. v. NMDU*, No. 83 Misc. 186, slip op. (E.D.N.Y. June 23, 1983) (apparently sustaining objections to effort by employer to confirm oral, interim award by status quo arbitrator); *but see New York Times Co. v. NMDU*, No. 83–4883, slip op. (S.D.N.Y. June 30, 1984). The Court also notes, however, that the Union is aware of the importance of adhering to such status quo orders. *See The New York Times Co. v. NMDU*, 517 F.Supp. 662 (S.D.N.Y.1981) (enforcing consent order to abide by all status quo orders).

submit to tri-partite binding arbitration to resolve this dispute.

SO ORDERED.