EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,
Plaintiff,

v.

THE NEW YORK TIMES CO. and New
York Newspaper Printing Pressmen's
Union No. 2, Defendants.

Dashiell Nowell Ballard
et al., Intervenors,

v.

The New York Times Co. and New
York Newspaper Printing Press-
men's Union No. 2, Defendants.

No. 92 Civ. 6548 RPP.

United States District Court,
S.D. New York.

Oct. 6, 1998.

Proskauer Rose LLP, New York, NY,
By: Bernard Plum, Joseph Baumgarten,
Lloyd Chinn, Laurie S. Leonard, for the
New York Times Co.

Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, By: Michael Connery, Carl G. Guida, for New York Newspaper Printing Pressmen's Union No. 2.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

The New York Times Co. (the "Times") has moved (1) to extend a temporary restraining order against the New York Newspaper Printing Pressmen's Union No. 2 (the "Union") to a permanent injunction and (2) to hold the Union in contempt of court for allegedly violating the TRO.

**Background**

On September 2, 1992, the EEOC filed a suit against the Times and the Union under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e–2000e–17. The complaint alleged, among other things, that the defendants had discriminated against women and minorities who were casual employees hired at the "shape" at the start of each work shift in the pressroom at the Times. On April 5, 1995, a Consent Decree was entered. Pursuant to the Consent Decree, the Union and the Times agreed to work towards achieving a goal of twenty-five percent minority and female representation among Junior Pressmen ("Juniors") in the Union's bargaining unit at the Times, as well as twenty-five percent minority and female representation on the Times's casual list. The Decree was to last ten years, unless vacated sooner, and the Court was to retain jurisdiction "for the purposes of enforcing [the Decree's] provisions and for the purpose of enabling any of the parties to apply to the Court for such further orders and directions as may be necessary or appropriate to effectuate the provisions of this Decree." (Decree ¶ 10.)

On May 8, 1997, the Court enjoined the transfer of 15 Juniors to the Times's bargaining unit. On March 3, 1998, the Court granted a motion to intervene, pursuant to Fed. R. Civ. Pro. 24(a)(2), by casual employees for the limited purpose of presenting the issues of whether The New York Times's and the Union's pre-booking procedures and utilization of an extra shift in November and December 1997 violated the Consent Decree or the Court's order of May 8, 1997. On August 12, 1998, the Court found that the Times and the Union had in fact violated the Consent Decree by agreeing, without giving prior notice to the EEOC, to transfer fifteen Juniors to the Times's bargaining unit from that of the Daily News; that the Union had violated the Consent Decree and the May 8, 1997, order of this Court, with the acquiesence of the Times, by using pre-booking procedures to make the transferees *de facto* fulltime employees at the Times despite that order's rescinding the transfer from other newspapers to the Times; and that the Union and the Times had violated the consent decree by adopting and implementing a policy, without giving prior notice to the EEOC, whereby Times Juniors were allowed to work seven shifts a week between Thanksgiving and Christmas 1997. Among other relief ordered, the Court required that "due to the Times's and the Union's lack of notice to the EEOC, the Union and the Times notify the EEOC of proposed changes in working conditions of Junior Pressmen that would have an effect on the work opportunities of the Casuals at least 30 days in advance of any such proposed change." (Aug. 12, 1998, order at 35.)

On August 19, 1998, the Times applied for a temporary restraining order, which Judge Rakoff, sitting in Part I, granted, in response to an alleged work slowdown by the Union at the Times's College Point, Queens, and Edison, New Jersey, plants during the August 19, 1998, day shift. Judge Rakoff ordered:

1. That [the Union], its officers, agents, representatives, employees, members, and all those in active concert or participation with them or any of them, who receive a notice of the Order, are hereby enjoined and restrained from in any

manner continuing, calling, threatening, instigating, directing, encouraging, causing, assisting, or participating in any strike, work stoppage, slowdown, refusal to work as assigned, picketing or any other interruption in the normal and timely delivery of newspapers and/or in the operation of [the Times's] College Point, New York, and Edison, New Jersey plants by and among any of [the Times's] employees represented by the Union, over any question, difference, dispute, complaint or grievance arising out of the interpretation or application of the Consent Decree of this Court dated April 5, 1995 or any order issued pursuant thereto; and

2. That the Union, its officers, agents, representatives, employees, members, and all those in active concert or participation with them, or with any one of them, who receive a notice of the Order are directed to advise all New York Times employees represented by the Union to cease engaging in any of the acts described in paragraph 1 above, and to take all steps necessary to: (a) advise all New York Times employees represented by the Union of the existence and terms of this Order and (b) ensure compliance by those employees with this Order, including but not limited to the imposition of Union discipline.

A hearing on the application for a permanent injunction was scheduled for September 3, 1998.

On September 2, 1998, the Times, by order to show cause, moved to hold the Union in contempt of court for allegedly violating the terms of Judge Rakoff's TRO.

The Court consolidated the two motions and ordered the parties to present their evidence and arguments in both matters the following day. At the close of the hearing, with the consent of the parties, the Court extended the TRO until the issuance of this Order.

Upon consideration of the evidence taken in the course of a two day hearing, the post-hearing briefs submitted by the parties, and letters submitted by the parties on September 25, 1998, and for the reasons set forth herein, the Court hereby grants the Times's application for a permanent injunction and denies the Times's motion to hold the Union in contempt of court.

*Events Bearing on the Application for a Permanent Injunction.*

The circumstances which led the Times to seek the TRO on August 19, 1998, can be summarized as follows. On August 6, 1998, the management of the Times and the president of the Union entered into an agreement regarding staffing at the College Point and Edison printing plants. (Tr. at 85.) The Times claims to have been concerned about a shortage of Journeymen[1] for the fall, when, according the testimony of Jay Sabin, the Times's director of labor relations, the paper would have more pages. (Tr. at 126.) Under the agreement, the Union assented to advance 15 Juniors to Journeymen on September 1, and another 10 about three weeks after that. (Tr. at 116.) During conversations in early August 1998, John Heffernan, the Union's president, told Sabin that there were notices posted in the Times chapel and that there was to be a meeting of the

---

1. Journeymen are senior employees who run the newspaper presses. Junior Pressmen, or Juniors, assist the Journeymen in running the presses. In order to become a Journeyman, a Junior must ordinarily work approximately 20 years, averaging five and a half shifts a week. The decision to promote Juniors to Journeymen is made exclusively by the Union. In the absence of Journeymen, Juniors may be assigned the work of running the presses in order of their Union seniority. Casuals, however, only fill Junior positions and are never allowed to serve as Journeymen. Casuals are non-Union members who present themselves for hire at the Times's printing plants before the start of any given shift, to fill any vacancies that may exist. The Casual List has been reconfigured pursuant to the Consent Decree. A Casual is eligible to become a member of the Union upon working 110 shifts within either the first or last six month period of the year. (Aug. 12, 1998, order at 5; 9 n. 14.)

Union's executive board on September 1, 1998, "for the purpose of effectuating the Union's agreement." (Tr. at 120.) Sabin understood that "at that meeting ... the executive board would, I guess, either authorize the president or approve of the president's action to advance the 15 Juniors from Junior status to Journeyman status." (Tr. at 121.)

On August 12, 1998, as described above, this Court issued an order which, among other things, required the Times and the Union to give notice to the EEOC of any proposed changes in the working conditions of Juniors that would have an effect on the Casuals 30 days before such changes were to take effect. On August 14, 1998, Sabin and Heffernan had a telephone conversation in which they discussed the effect of the August 12 order on the agreement they had reached August 6 to advance 25 Juniors. According to Sabin,

> Mr. Heffernan for the first time expressed an opinion that he may not go through on the agreement, he may not comply with the agreement because of the Court's order. We had some discussion about the notice provision in the order ... about whether or not that covered the agreement. We had discussions about that. And I said to him, "If you have any concerns, you know, take the prudent course, just notify the EEOC and explain to them that because you had entered into this agreement before the Court's August 12 order, that you would request from the EEOC a shorter review period, shorter than the 30–day period provided for in the order, and perhaps the EEOC would give you that because you would effectuate your agreement by September 1."... [Heffernan] was essentially noncommital. He didn't disagree, he didn't agree.

(Tr. at 116.) Sabin and Heffernan arranged to meet in person on August 17.

Sabin and Heffernan spoke again by telephone on Sunday evening, August 16. According to Sabin, Heffernan canceled their meeting for August 17, saying that he wanted to spend the time meeting with the Union's counsel "for the purposes of crafting a settlement proposal which he would send over to us on [August 17]." (Tr. at 117.)[2] But on August 17 Heffernan telephoned Sabin, and they once again discussed the issue of advancing 25 Juniors. Sabin testified that Heffernan

> again expressed concern that [the advancement] may be prohibited under the order. I said to him, "whether that is a fair reading or not, notify the EEOC, tell them and, you know, try to seek a waiver or a shortening ... of the 30–day time period"... [but h]e was noncommittal.

(Tr. at 119.) According to Heffernan, in one of these conversations on August 16 or 17, "What I told Jay Sabin was that I would have to speak to my attorneys, given that an order was handed down by Judge Patterson, before we made any moves with the Juniors, and that was it." (Tr. at 86.) On more than one occasion after receiving the August 12 order, Heffernan did speak to the Union's counsel, and as of August 18, he testified that the Union was not ready to go forward with the plan to advance the Juniors. (Tr. at 89.) "[W]e were still reviewing and discussing the judge's order and the ramifications of that order. We were not going to make a rash decision and have to be [in court] again for something else." (*Id.*)

On August 18, 1998, the Times, through its outside counsel, sent a letter to the EEOC:

> This is to notify you regarding an agreement reached by The Times and

---

**2.** Sabin went on to testify that he was not sure if the proposal Heffernan referred to was "a proposal to deal with settling the issues that were raised just in the August 12 order or a discussion of settlement of the Consent Decree in its entirety." (Tr. at 117–18.) In any event, Heffernan told Sabin in their August 17 phone conversation that the Union had decided to "meet alone with the EEOC to talk settlement." (*Id.*)

the Pressmen's Union on August 6, 1998. We believe that this notice is not required by the Court's August 12, 1998 order because, *inter alia,* the agreement will not result in a change of working conditions of Junior Pressmen. We are nonetheless providing this notice to you as a courtesy.

As you know, The Times has been experiencing and continues to experience a shortage of Journeymen. For that reason, on August 6, 1998, the Pressmen's Union agreed to advance fifteen (15) Junior Pressmen to Journeyman status by September 1, 1998 and to advance an additional ten (10) Junior Pressmen to Journeyman status approximately three weeks thereafter. We believe that this action will have no adverse effect on the work opportunities of Casuals. Indeed, based on the rationale of the Court in ordering the recission of the transfer of fifteen (15) Junior Pressmen from other publishers to the Times, this action should enhance the work opportunities of Casuals.

According to the agreement between The Times and the Pressmen's Union, the first advances of Junior Pressmen to Journeymen status will take place no later than September 1, 1998.

(Ex. P–2, "O'Blenes Letter.") This letter is at the center of the current controversy between the parties.

At the time Heffernan received a copy of the O'Blenes letter, on August 18 or 19, Heffernan stated that the Union was "still cogitating over whether or not to promote." (Tr. at 89.) When he saw the O'Blenes letter, he was furious, and in a conversation with Sabin on August 19 he used at least one profanity. (Tr. at 90.)

I felt [the letter] was a misrepresentation, being that I did speak to [Sabin] earlier in the week, I told him I wanted to review with our lawyers what this order meant in terms of promoting Jun-

iors. I felt he was on board, because we always notified him of what we were doing. I felt that they were impatient. They would not wait a matter of a couple of days, being that September 1st was two weeks off. I was angry.

Sabin testified that this conversation took place "at about 10:30 in the morning." (Tr. at 121.) (Heffernan said it occurred "in the morning" and agreed it "quite possibly" was at ten o'clock. (Tr. at 95.)) Sabin then telephoned the plant managers, Tom Lombardo at College Point and Roland Caputo at Edison, to inform them of his conversation with Heffernan (Tr. at 121.) For his part, Heffernan testified that after hanging up with Sabin he talked by telephone to Frank Boccia, the dayside chapel chairman at the College Point plant. "In fact, it was right after, it was after lunch, about after lunch." (Tr. at 99.) But he testified that this conversation was strictly personal, as he had merely called to inquire about Boccia's mother, who "was put into a home the day before." (*Id.*) And he stated that he did not talk to anyone at the Edison plant until later in the day, after he learned that the Times was going to court. (*Id.*)

What prompted the Times to go to court was what it has alleged to be a work slowdown in both the College Point and Edison plants that occurred within minutes of the end of the 10:30 am phone call between Heffernan and Sabin. Caputo, the Edison plant manager, testified that the day shift press run at the Edison plant was running well until about 10:40 am. (Tr. at 16.) By that time, the presses had completed about 250,000 out of the 840,000 copies that were scheduled for that shift; if they had continued on that pace, he projected that the run should have been completed by 3 o'clock or 3:30 pm. (Tr. at 15.) But at 10:40, "the presses in Edison[3] went down like dominoes, one by one with web breaks[4] so that within ten minutes of

---

**3.** There are six presses in Edison, but they are not all used at every shift. (Tr. at 9.) For the

August 19, 1998, day shift, there were four presses running. (Tr. at 14; Ex. P–4.)

**4.** The "web" is the long, continuous roll of

hanging up the phone from his conversation with Mr. Sabin, there were no presses producing in the Edison plant at all." (Tr. at 16.) The actual "off time" was 5:48 pm. (*Id.*)

Lombardo, plant manager for College Point, testified that the presses there were running well in the morning on August 19, 1998–well enough that he thought it may even have been possible for College Point to print a portion of the papers that were supposed to be printed at Edison. (Tr. at 59.) But at approximately 11:08, as Lombardo was on the phone with Caputo, he testified that each of the four presses running at College Point went down, one by one, with web breaks, within two and a half minutes of each other. (Tr. at 60.) The target time to complete the run was 2:46 pm, and until the presses all went down shortly after 11 o'clock, Lombardo testified that they were running at a rate such that the run would be completed early. In the end, the "off time" was 3:57 pm. (Tr. at 61.)

Once the presses got back up following the domino-like collapses, each plant apparently suffered an unusually high number of web breaks for the duration of the August 19, 1998, day shift. Caputo testified that at the Edison plant the "experience is that we average approximately one to three web breaks per shift per press." (Tr. at 12.) In contrast, during the August 19 day shift, the presses averaged twelve breaks each. (Tr. at 31.) At College Point, by 11:30 am 65 percent of the run had been completed and there were only three web breaks; there were 24 web breaks for the rest of the shift.

Correspondingly, the August 19 night shift at each plant ran smoothly. (Tr. at 33; 65.) And the August 26 day shifts-comparable in terms of the size of the press run to August 19, and the same day of the week-finished ahead of schedule, 83 minutes early in Edison and 90 minutes early in College Point. (Tr. at 26–27; 61.)

*Events Bearing on the Motion to Hold the Union in Contempt of Court.*

On the evening of August 19, 1998, after receiving a copy of the TRO, Caputo presented it to Donald Hawksby, the Union's assistant chapel chairman for the night shift at Edison. (Tr. at 34.) The following morning, Caputo gave a copy to the assistant chapel chairman for Edison's day shift, Frank Boccia. (Tr. at 35–36.) Caputo testified that Boccia had not yet heard about the TRO. (*Id.*)

Heffernan testified that he received a copy of the TRO by fax at his home the evening of August 19. (Tr. at 103.) He stated that Hawksby and Joe Lawlor, the nightside chairman at College Point, called him

because they were served and they were nervous. I told them to follow what it ·says, notify all the members that we have a TRO on us and post it and let everybody know on each press that that is what is happening now … All our chairmen, the chairmen was served and yes, I told them, each one, to go out and notify the people and make sure it was posted and follow it.

(Tr. at 103–04.) Heffernan testified that on the morning of August 20, when he woke up around 6:30 or 7:00, he spoke to the dayside chairmen. Heffernan stated that he did not attend a meeting or otherwise stop in at the Edison plant for the rest of August. (Tr. at 106.)

On August 20, Heffernan and Sabin both attended a meeting of the Joint Apprenticeship Committee ("JAC"). (Tr. at 107.) The JAC meets twice a year to determine whether Casuals have worked the required number of shifts to qualify for Union membership. (*Id.*) At this meeting, Heffernan expressed his fury towards Sabin and the Times. According to Sabin, the "conversa-

---

newspaper that is fed through the press. It is under enormous tension as it travels through the press, and it can reach 100 feet in length.

A "web break" is a tear in the paper web; it causes the press to shut down. (Tr. at 10–11.)

tions were more about the letter that had been sent to the EEOC" than about the TRO. (Tr. at 122.) However, Sabin went on to testify,

[Heffernan] said at one point that, as far as he was concerned, he had sent the TRO to the chapel. He had spoken with his chapel chairmen, and he said that he could wipe his ass with this thing [the TRO] ... [And] during the course of the JAC meeting, he said that the Times hadn't seen anything yet.

(Tr. at 123.)

When pressed at the hearing, Heffernan did not deny making either statement (Tr. at 109–10), though he insisted that "No threats were made to Jay Sabin" (Tr. at 108) and that "in our relationships, there is a lot of posturing, and my posture right then in front of Jay Sabin in an angry tone was that this was not going to bother me or impede my business or change my way of doing things, and I was angry when I said it, and that's exactly what was said ..." (Tr. at 109.)

Nick D'Andrea, the Times's deputy plant manager at Edison, testified that on September 1, between 7:00 and 7:30 in the evening, he learned of a problem with the shape for the night shift.

[Mike Lavery, the shift foreman] told me that there was a problem with the shape, and I asked him what the problem was. He told me that two journeymen were scratched and replaced but they had called in and said they were on their way in and Donald [Hawksby] wanted to put them to work. And I asked Mike what he told Donald, and he said no, that they were scratched and replaced already by the hiring foreman ... I told Mike that he had done the right thing. They were scratched and they were replaced.

Just a couple of minutes later, Donald came into the room and said what can we do, you know, how can we work around this? And I said to Donald, I said they were already scratched and replaced. There is nothing we can do

about it. He asked me if there is anything that we can do about that. He tried to explain that there was a mistake, that the guys were on vacation for a couple of weeks. Just the previous night we had changed the starting time due to a new edition that we were putting out. We used to start at 7 o'clock, now we were starting at 6:30 onthat particular night, and he said he wasn't aware of the starting time change. I said it really didn't matter, number one, like I said before, they were scratched and replaced. Number two is we got this EEOC thing going on, and we can't fool around with that, it's not something we can fool around with. And he was, you know, being persistent, that he wanted to get these guys on. They were already on their way in or may have been there already, and I said there is really nothing I can do about that. It's a dead issue, you know, if we did put them on, number one, that there is still people that were on the shape still lingering around that weren't put on to work, casuals, outside card men, and it would be like throwing it in their face, we just hired two people that walked in late after the shape was done. And I said it was a dead issue, we really couldn't do anything about it.

(Tr. at 73–75.)

The daily New York Times paper is produced in two press runs during the night shift, an early run that handles the "soft news" and a late run that handles the breaking news. (Tr. at 153.) According to Caputo, the early run on the September 1 night shift was "a little bit off the pace." (Tr. at 154.) For the late run, the target off time was 2:19 am, and the actual off time was 3:58 am. (Tr. at 154.) According to Caputo, overall on the late run the actual off time averages 30 minutes past the target off time, though mid-week (September 1 was a Tuesday) the runs are better. (Tr. at 38.) Caputo could not recall a night in recent memory where the actual

off time was as late as it was the night of September 1. (*Id.*)

Caputo also testified that there were an unusually high number of web breaks on the September 1 night shift. From July 1 to September 2, there were 10 nights where Edison averaged less than one break per press; 17 nights with one break per press; 21 nights with two; four nights with three; and one night with five. On the night of September 1, on the late run, there were 36 web breaks on five presses-over seven breaks per press. (Tr. at 40.) But on the night of September 1, "we did not have an inordinately high number of calls to maintenance, nor did we have an inordinately high number of problems discovered by maintenance." (Tr. at 151.) Of the 36 breaks on the late run, 23 of them occurred on two of the five presses, presses number 22 and 23. (Tr. at 155; Ex. U–4.)

> Caputo stated that, as a consequence,
> virtually all of the trucks that dispatched from the New York Times Edison plant were late. Many of them an hour to an hour and a half past their scheduled dispatch time. This led directly to late dispatches from the wholesaler. Eighty-five percent of all the retail route trucks out of the New Jersey wholesale locations were dispatched late, resulting in route completions past 6:30 in the morning, which is critical to us ... [The newsdealers'] unsold copies are not returned to us yet. So we don't know what the impact was on the sale, and the intangible is not just the lost sales for that day, but which customers bought the competitor and may not come back and purchase the paper again.

(Tr. at 44–45.)

## Discussion

*The Times's Application for a Permanent Injunction.*

*Jurisdiction.*

■ The Times argues that the production problems which occurred on August

19 were due to deliberate conduct on the part of the Union, and that it is no mere coincidence that the presses went down so shortly after Heffernan's angry conversation with Sabin. While it may be that the poor production was caused by willful human error and that this conduct was undertaken in direct response to the Times's action of sending the O'Blenes letter to the EEOC, it does not necessarily follow that the Times is entitled to an injunction. The threshold issue of whether this Court has jurisdiction in this matter must first be addressed.

The jurisdiction issue centers on a relatively straight-forward inquiry: was the O'Blenes letter a good faith effort on the part of the Times to "comply with the provisions of [the Consent] Decree"? (Decree ¶ 10.) Under the terms of the Consent Decree, the Court has the authority to issue an injunction prohibiting work slowdowns ("or other interruption of normal employment or production") "arising out of any action" taken to comply with the Decree. (*Id.*) The August 12, 1998, order of this Court was made pursuant to the Decree; the Times contends that the O'Blenes letter was an attempt on its part to comply with that order and, by extension, the Decree. (Times Mem. at 24–25.) Since the Union's work slowdown on August 19 was a direct response to that effort to comply with the Decree and orders of the Court pursuant thereto, the argument continues, the Court has jurisdiction to enter an appropriate injunction.

The Union argues that the O'Blenes letter was a bad faith attempt to force the Union to approve the agreement reached on August 6 to advance the Juniors and was not an effort to comply with the August 12 order. (Union Mem. at 5–6.) The Union submits that this is an ordinary labor dispute and that there is no jurisdiction for a Federal court to issue a restraining order in such a case. 29 U.S.C. § 104; *Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Assn, et al.,*

457 U.S. 702, 708, 102 S.Ct. 2672, 73 L.Ed.2d 327 (1982). (Union Mem. at 3–4.)

The Times's decision to send the O'Blenes letter was made in good faith. The Times had an agreement with the Union to advance 15 Juniors on September 1, which was less than three weeks from the date of the August 12, 1998, order. That order required the parties to notify the EEOC of any *proposed* changes in the working conditions of the Juniors that could affect the job opportunities of the casuals *at least 30 days in advance* of any such proposed change.

It was important to the Times to have the Juniors advanced. Sabin testified that the Times had insufficient manpower the last Saturday night of July and had to run one less press as a result. (Tr. at 126.) The Times also lost presses due to a lack of Journeymen in the fall of 1997. (Tr. at 127.) Sabin testified that the Times anticipated a shortage in the fall of 1998 as well, on account of heavy advertising and increased paging. (Tr. at 126.)

The provision in the August 12, 1998, order requiring 30 days' notice placed the Times under time pressure to obtain adequate Journeyman staffing. Furthermore, in the order both parties had been found to have violated the Consent Decree by not giving the EEOC notice. Consequently, on more than one occasion after the August 12 order was issued, Sabin urged Heffernan to notify the EEOC of the agreement to advance the Juniors and to ask the EEOC for expedited approval, in light of the fact that the proposed agreement was developed before the order's mandate to give 30 days' notice. (Tr. at 116, 119.) Although Heffernan never actually committed the Union to advancing the Juniors, he and representatives of the Times had formed a proposed agreement to do so.[5]

If the Times had agreed to wait much longer to notify the EEOC, it would have been hard for the Times to press that the agreed upon advancement actually go into effect on September 1, 1998. If the EEOC raised objections to the advancement, or had needed more time to consider it, then the advancement would have been delayed. The Times understandably wanted both to comply with the Consent Decree and the August 12 order as well as make sure that there would be enough Journeymen in the pressroom on September 1, 1998. The O'Blenes letter represents a good faith attempt to comply with the Decree and ensure full staffing, although it may not have been as good labor relations as acceding to Heffernan's request for more time to consult with the Union's attorneys about negotiations with the EEOC.

The Union notified the Court on September 25, 1998, that the Times had filed an unfair labor practice charge with the NLRB. In the charge the Times asserted that the Union had "reneged on an oral agreement." The Times does not dispute that the agreement in question is the August 6, 1998, plan to advance the Juniors. The Union contends that this filing demonstrates that the dispute between the parties is a labor disagreement and does not properly arise under the Consent Decree. Unquestionably, the issue of whether the Union reneged on an agreement and refused to bargain collectively is not one for this Court. However, the O'Blenes letter is a separate matter. The Times had a good faith belief that it should give notice to the EEOC of the proposed advancement, even as a courtesy, in order to comply with the August 12 Court order. To the extent that actions taken or not taken by the parties under the collective bargaining agreement may impact the Consent Decree and orders entered pursuant thereto, the Court does have jurisdiction. The Court finds the O'Blenes letter was a good faith attempt by the Times to comply with

---

**5.** Sabin himself knew that the Union would not be able to commit to the agreement until its executive board voted, and that a meeting was scheduled for September 1. (Tr. at 120–21.)

the terms of the Consent Decree and this Court's order of August 12, 1998.

*Analysis of the Merits.*

██ The facts adduced at the hearing prove by a fair preponderance of the evidence that production problems at the Times's two plants during the August 19, 1998, day shift were deliberately caused by the Union and that this work slowdown was in direct response to the O'Blenes letter. The most compelling proof is the timing and nature of the press shutdowns during that shift. The telephone conversation between Heffernan and Sabin, in which Heffernan used expletives and admitted that he was angry (Tr. at 90), took place around 10:30 am (Tr. at 121.) About ten minutes later, the Edison presses "went down like dominoes." (Tr. at 16.) About a half hour after that, the presses in College Point also went down, one by one, within two and a half minutes of each other. (Tr. at 60.) For the rest of the shift, the presses at both plants suffered a much higher than usual number of web breaks, when compared to comparable shifts in terms of number of pages and day of the week. (Tr. at 26–27; 61.) The shift in Edison ran over two hours late, and the shift in College Point finished more than an hour behind schedule. (Tr. at 15–16; 61.) A most convincing piece of evidence that this was a concerted job action is that at the very next shift, the August 19, 1998, night shift, the presses at both plants ran smoothly. (Tr. at 33; 65.)

Though the proof is entirely circumstantial, it is too strong to be dismissed as mere coincidence. Direct evidence is rarely available in cases such as this one, and in any event, circumstantial evidence is no less worthy than direct evidence. 1A Wigmore, *Evidence* § 26 (Tillers rev.1983). Furthermore, no evidence has been offered to the contrary.

Both parties agree that the Court may issue an injunction only when there is no adequate remedy at law and when the moving party would suffer irreparable harm without the equitable relief. *New York State Nat'l Org. for Women v. Terry,* 886 F.2d 1339, 1362 (2d Cir.1989.) Slowdowns in the production of a perishable product such as a newspaper may involve financial losses to the newspaper company, to be sure, but the cost of late deliveries cannot be assuaged simply with money. The loss of goodwill among advertisers and readers may be incalculable. *New York Times Co. v. New York Stereotypers' Union No. 1,* 1992 WL 251457 at 3 (S.D.N.Y. 1992); *Philadelphia Newspapers Inc. v. Newspaper & Magazine Employees Union,* 647 F.Supp. 236, 245 (E.D.Pa.), *aff'd* 808 F.2d 1517 (3d Cir.1986); *New York Times Co. v. Newspaper and Mail Deliverers' Union,* 592 F.Supp. 1043, 1051 (S.D.N.Y.1984).

The Times will suffer irreparable harm from such loss of goodwill without an injunction. The Consent Decree lasts until 2005, and without the prospective disincentive of an injunction, the Union would be able to engage in future job actions arising out of disputes related to the Decree that could cause severe damage to the Times. The Union misunderstands the nature of the "irreparable harm" requirement for the issuance of injunctions when it argues that there have been no evidence of slowdowns since August 19. (Union Mem. at 7–8.) Even assuming that there was no job action on the September 1 night shift, the Union's analysis is off the mark. The Times does not need to show a pattern of harmful Union activity. A concerted job action at both plants during the same shift, in response to the employer's attempt to comply with an order of the Court in administering the Consent Decree, is sufficient to establish irreparable harm when the circumstances which gave rise to the job action remain in place. In *New York Stereotypers, Newspaper & Magazine Employees Union,* and *Newspaper and Mail Deliverers' Union,* the parties were engaged in ongoing labor disputes which led to various job actions on the part of the unions. Because the conditions which led to these job actions had not been resolved

at the time the newspapers in those cases applied for injunctive relief, the courts granted injunctions. Here, the Consent Decree and orders issued thereunder, such as that of August 12, 1998, remain in effect, and it is quite probable that the parties will have disagreements related to the Decree and orders in the months and years to come. Because the Union has, through the August 19, 1998, day shift work slowdown, shown that it will disrupt the Times's operations in response to the Times's good faith efforts to comply with the Consent Decree, it must be enjoined from such actions in the future, lest the Times suffer irreparable harm. The Union itself will not be harmed by such an injunction, as it merely requires its members "to work at a normal pace." *New York Stereotypers, 1992 WL 251457* at 4.

For the foregoing reasons, then, the Times's application for a permanent injunction is granted. It is hereby ordered:

1. That the New York Newspaper Printing Pressmen's Union No. 2 ("the Union"), its officers, agents, representatives, employees, members, and all those in active concert or participation with them or any of them, who receive a notice of the Order, are hereby enjoined and restrained from in any manner continuing, calling, threatening, instigating, directing, encouraging, causing, assisting, or participating in any strike, work stoppage, slowdown, refusal to work as assigned, picketing or any other interruption in the normal and timely delivery of newspapers and/or in the operation of The New York Times's College Point, New York, and Edison, New Jersey plants by and among any of The New York Times's employees represented by the Union, over any question, difference, dispute, complaint or grievance arising out of the interpretation or application of the Consent Decree of this

Court dated April 5, 1995 or any order issued pursuant thereto; and

2. That the Union, its officers, agents, representatives, employees, members, and all those in active concert or participation with them, or with any one of them, who receive a notice of the Order are directed to advise all New York Times employees represented by the Union to cease engaging in any of the acts described in paragraph 1 above, and to take all steps necessary to: (a) advise all New York Times employees represented by the Union of the existence and terms of this Order and (b) ensure compliance by those employees with this Order, including but not limited to the imposition of Union discipline.

*The Times's Motion to Hold the Union in Contempt of Court*

The Times also moves to hold the Union in contempt of court for an alleged violation of Judge Rakoff's TRO during the September 1, 1998, night shift.[6] However, on this issue the standard of proof is more demanding and the Union has offered counterproof.

■ The Times and the Union agree that for the Court to hold a party in civil contempt, the order which is alleged to be violated must be clear and unambiguous; the proof of noncompliance must be by clear and convincing evidence; and the party accused of contempt must not have been reasonably diligent and energetic in attempting to accomplish what was ordered. *U.S. v. Local 1804–1, International Longshoremen's Ass'n,* 44 F.3d 1091, 1096 (2d Cir.1995); *EEOC v. Local 638, Local 28, Sheet Metal Workers' Intern. Ass'n,* 753 F.2d 1172, 1178 (2d Cir.1985). It is also the case that a union is not automatically liable for the conduct of its members. *New York Times Co. v. News-*

---

**6.** Newspapers dated September 2, 1998, were printed the previous night during a shift which began in the evening hours of September 1 and went into the early morning hours

of September 2. To avoid any confusion, this shift, during which a slowdown allegedly occurred, will be referred to as the "September 1 night shift."

*paper and Mail Deliverers' Union*, 740 F.Supp. 240, 242 (S.D.N.Y.1990).

■ There is no doubt that Judge Rakoff's order was clear and unambiguous and known to the Union, but the evidence that the Union violated it is not clear and convincing. First, even assuming that there is sufficient evidence of a work slowdown on the September 1 night shift, its connection to a "question, difference, dispute, complaint or grievance arising out of the interpretation or application of the Consent Decree of this Court dated April 5, 1995 or any order issued pursuant thereto" is too weak. The Times alleges that a slowdown occurred at the Edison plant in response to an altercation between Hawksby, the assistant Union chairman for the night shift at Edison, and D'Andrea, the deputy plant manager there. D'Andrea testified that he had two reasons for not allowing the late-arriving pressmen to work the shift. One was that they had already been replaced, and to bump their replacements would be "like throwing it in [the replacements'] face." (Tr. at 75.) Second, D'Andrea testified that he told Hawksby that "we got this EEOC thing going on, and we can't fool around with that, it's not something we can fool around with." (Tr. at 74.) However, there is no evidence that Hawksby made any threats of a slowdown or any sort of retaliation, that he went away angry, or that he told any Union members working that night about his conversation with D'Andrea. McConnell, the pressman in charge, and Monahan, the foreman, both of whom testified with sincerity and credibility, stated that they did not hear anything about the dispute over the shape until a day or two after the shift in question. (Tr. at 280; 314.) [7]

Although the production problems at the Times during the September 1 night shift were out of the ordinary (Ex P–9; Tr. at 39), the evidence that these problems related to the dispute over the shape is less so. The September 1 night shift had two separate runs, an early run, during which "soft news" sections were printed, and the late run. The early run, which would have occurred soon after the dispute, was only "a little bit off the pace," according to Caputo. (Tr. at 154.) Most of the alleged problems occurred on the late run, whereas a slowdown over the shape would be expected to occur right away. And during the late run, when 36 web breaks occurred, 23 of them were on just two of five presses. (Tr. at 155; Ex. U–4.) This suggests that even if the web breaks were caused by deliberate human interference, that it was carried out by a few angry pressmen and was not a concerted effort by the Union.

McConnell and Monahan both testified that they believed that the problems that night were mechanical or electrical in nature. Many of the problems apparently were due to operational difficulties with so-called 3/4 roll paper (Tr. at 278–80), and McConnell also testified that it was his opinion that the problems on the September 1 night shift were caused by the slitter. (Tr. at 295.) McConnell testified that "there is nobody on that press that worked that press with me that night that would sabotage a press." (Tr. at 303.) As to why there were 10 web breaks during the late run on press 22, McConnell said that "it is not typical. It's like a mystery, this Edison here. We just never know when you are going to have a good night or a bad night." (Tr. at 280.)

In fact, the pressmen were responsible for at least two important actions on the September 1 night shift at Edison that *saved* time on the production run. Pressman Steve Murphy noticed a problem with the spray bar installations. (Tr. at 171–72; Ex. U–2.) And Caputo also testified that the pressmen solved a problem with press 25 that caused it to produce only 5,500 copies by 1:46 am; after the pressmen intervened, the press ran about 80,000 cop-

---

7. The pressmen in charge are a subset of Journeymen. The foremen are members of the Union. (Tr. at 9.)

ies in the last two hours of the shift. (Tr. at 242–43; Ex. P–15, p. 3.)

It is against this backdrop that Heffernan's comments and actions (or lack of action) must be viewed. Heffernan's fury at the O'Blenes letter was only exacerbated by the Times's going to court to obtain the TRO. But while his comment to Sabin on August 20 that "he could wipe his ass with this thing," referring to the TRO, was certainly contemptuous, the statement by itself is not sufficient to hold him in contempt of court. It is the Times's burden to show that Heffernan was prevaricating when he testified that he told the chapel chairmen to post the TRO and ensure compliance by the members. (Tr. at 104.) Caputo's testimony that Boccia told him, on the morning of August 20, 1998, that Boccia had not yet heard about the TRO, does not necessarily contradict Heffernan's testimony. Heffernan did not specify whether he called Boccia at Boccia's home or at the Times chapel. (Tr. at 104–05.) Caputo stated that he met with Boccia as soon as Boccia came into work. (Tr. at 35.) Thus, it is possible that Boccia spoke to Caputo first, then to Heffernan, within a matter of minutes in the 6:45 to 7:00 am range. But the Times did not call Boccia as a witness, so the best evidence it has is Caputo's second-hand testimony.

And there is simply no evidence that Heffernan knew about the dispute between Hawksby and D'Andrea regarding the shape on September 1, nor any evidence that Heffernan's anger pervaded the press room in such a way that the Union members were primed to take a job action even in the absence of an express order to do so. Because of the lack of any such evidence, and because the production ills for the shift in question were not clearly and convincingly caused by deliberate Union interference, the Times's motion for contempt of court is denied.

**IT IS SO ORDERED.**